[Civ. No. 21008. First Dist., Div. Two. Feb. 24, 1964.]

ROGER J. COOPER et al., Plaintiffs and Respondents, v. MART ASSOCIATES, Defendant, Cross-complainant and Appellant; ARMSTRONG CORK COMPANY, Defendant, Cross-complainant and Respondent.

Boyd, Flageollet & Benson, Boyd, Benson & Gregory and Herbert Chamberlin for Defendant, Cross-complainant and Appellant.

Bronson, Bronson & McKinnon and Harold R. McKinnon for Plaintiffs and Respondents.

O'Connor, Moran, Cohn & Lynch, Harold H. Cohn and George Olshausen for Defendant, Cross-complainant and Respondent.

AGEE, J.—Defendant Mart Associates is the master-lessee of the Western Merchandise Mart, a 10-story block-square building fronting on Market Street, in San Francisco. Some 500 tenants rent from Mart, about 75 of which are on the second floor. The spaces rented are used for the purpose of displaying and selling furniture, home equipment and related goods.

On the night of August 5, 1958, a fire occurred on the second floor. The plaintiffs in this ensuing damage action are 22 second-floor tenants and 3 insurance subrogees. Armstrong Cork is the second-floor tenant of the space in which the fire originated. It was named in plaintiffs' complaint as a defendant and it cross-complained against defendant Mart. Plaintiffs were nonsuited as against Armstrong on the ground that there was no evidence of negligence on its part.

The cause of the fire could not be determined and the trial court instructed the jury that, in considering the issue of

Mart's negligence, it was restricted to the question of whether Mart had negligently allowed the fire to *spread* after it had started.

The jury returned a general verdict against Mart in favor of all plaintiffs on their complaint and in favor of Armstrong on its cross-complaint against Mart. Mart appeals from the judgment entered thereon. No issue is made as to the *amounts* of the respective awards.

 At Mart's request, a form of special verdict was submitted to the jury. The first interrogatory was general and is as follows: "Was defendant MART ASSOCIATES negligent in some manner which was a cause of the spread of the fire?" The jury's answer was "Yes."

Six specific interrogatories followed, to be answered only if the answer to the above general interrogatory was "Yes." The answer was "Yes" to the following specific interrogatory: "Was the spread of the fire caused by a failure of Walter Little [night watchman] to enter and inspect the interior of the Armstrong Cork premises?"

All of the remaining specific interrogatories except one were answered with a "No." As to that one, the answer was "Undecided because of contradictory testimony." The burden of proving the affirmative of the issue embodied in that interrogatory was upon respondents and therefore the answer given by the jury had the same legal effect as an answer in the negative.

 By these five negative answers, the jury found that the spread of the fire from the Armstrong Cork premises was *not* caused (1) by a failure of Mart to construct the glass partitions all the way to the ceiling, or (2) by a delay of John Anderson (janitor) in reporting the fire to Walter Little, or (3) by a delay of Walter Little in reporting the fire to the fire department, or (4) by a failure of John Anderson to use the fire extinguisher and fire hose, provided by the building, after he first discovered the fire, or (5) by a failure of Walter Little to use such fire extinguisher and fire hose after the fire was reported to him. As to (3) above, the jury added: "There was no delay after he became aware of the fire."

Respondents point out that the general finding of negligence may be supported by any evidence of negligence in the record on which no finding was made by the special verdicts. (*Hudgins* v. *Standard Oil Co.*, 136 Cal.App. 44, 50 [28 P.2d 433].) However, it is unnecessary to discuss this in view of our conclusion that the following question must be answered in the affirmative.

*Is there substantial evidence to support the jury's finding that the spread of the fire was caused by night watchman Little's failure to enter and inspect the interior of the Armstrong premises?*

There were two fires on the night of August 5, 1958. The first occurred about 9:30. Janitress de la Fuente detected smoke in the space occupied by Armstrong Cork. She summoned Little and turned on the lights. He inspected the premises and called the fire department. It arrived in six minutes.

The firemen discovered that the smoke was coming from some smoldering rugs which were hung fan-like from the ceiling, just below some recessed lights. They removed two of these rugs and wetted them down. This took about five minutes. On leaving the premises, Battalion Chief Dillon told Little that he thought that "everything was all right, but if he [Little] was uncertain about anything, to give us a call immediately."

Janitress de la Fuente testified that, after everyone had gotten out, she turned off all of the Armstrong lights and left the windows and door open in order to "get the place ventilated"; that she was directed to do this by head janitor Spingola; that she then resumed work in another area of the second floor.

Little made two trips back to the second floor. He testified that he "was worried" and wanted to check for smoke and "to see if anything was reoccurring"; that his first trip was about 10 p.m.; that he could smell smoke but he did not enter the Armstrong space; that there were no lights on inside there; that he just stayed in the corridor outside and peeked in; that after taking this peek he went back to his desk in the lobby on the first floor.

Little testified that he again went up about 10:35 p.m.; that he "went through the same thing"; that he smelled smoke but did not see any; that he could not recall whether the door to the Armstrong space was open or closed; that he was satisfied that the smoke was coming from Armstrong but could not determine from where he stood in the corridor from what part of its space it was coming; that he *made no effort to determine this.*

Little was alerted by Janitress Boutte about 11:15 p.m. She came down the stairway from the second floor to the first floor, yelling "fire" repeatedly. Little attempted to go up the stairway to check but was driven back by the smoke. He

then telephoned the fire department at 11:19 p.m. and they again arrived within six minutes.

However, by that time flames were coming out of the windows and the fire had increased to such proportions that it was not extinguished until 5:30 a.m.

Mart's general manager testified that it was one of the duties of the night watchman to watch out for the presence of fire and to call the fire department immediately "unless it [the fire] was confined to a wastebasket." All of the leases expressly provided that Mart's employees could enter and inspect any of the leased premises.

At the time of the first fire, Janitress de la Fuente had shown Little where the light switches inside the Armstrong premises were located. By going in and turning on the light, the first fire was easily located. It is reasonable to conclude that a similar inspection would have disclosed the second fire. The effectiveness of such action was demonstrated by the promptness with which the first fire was extinguished. Yet Little chose to stay out in the corridor and simply peer into the darkened interior.

In our opinion, there is substantial evidence to support the jury's finding that the spread of the fire was caused by Little's failure to enter and inspect the interior of the Armstrong premises.

Appellant argues that Little was excused from making any more of an inspection than he did because he believed that the smoke which he smelled came from the first fire. However, this merely presents an issue of fact which the jury determined adversely to appellant.

 *Waiver.* Paragraph 16 of the uniform lease prepared by appellant provides as follows: "Lessee, as a material part of the consideration for this lease, hereby waives all claims for loss of property, by fire or water or theft or otherwise, occurring in the demised premises or in said building."

Paragraph 17 provides as follows: "This lease is made upon the express condition that Lessor is to be free from all liability and claim for damages by reason of any injury to any person or persons, *including Lessee,* or property of any kind whatsoever and to whomsoever belonging, *including Lessee's,* from any cause or causes whatsoever while in, upon, or in any way connected with the said demised premises during the term of this lease or any extension hereof or any occupancy hereunder, Lessee hereby covenanting and agreeing to indemnify and save harmless Lessor from all liability,

loss, cost and obligations on account or arising out of any such injuries or losses however occurring, *provided, however, that nothing herein shall be construed as relieving Lessor of liability for its own or its employee's negligence.*" (Italics ours.)

Appellant contends that the concluding provision italicized above is limited in its application to paragraph 17 and does not affect paragraph 16. We do not agree.

Under paragraph 17, as to lessee's property upon the demised premises, it is provided that lessor is relieved of liability for any kind of damage thereto. As to the property of *others* upon the demised premises it is provided that lessee *indemnifies* lessor against liability for any kind of damage thereto.

Neither of these two results obtains, however, when the liability of the lessor is based upon "its own or its employee's negligence." In that event, appellant-lessor has agreed that it shall not be relieved of liability.

Appellant argues, however, that the damage herein was caused by fire and that the particular provisions of paragraph 16 control the general provisions of paragraph 17. Appellant says that paragraph 16 refers to "all claims for loss of property by fire or water or theft." However, the provision goes further than that. It covers "loss of property, by fire or water or theft *or otherwise.*" The effect of these last two words is that it makes the provision applicable to "loss of property" resulting from any cause whatsoever. Thus, paragraph 16 is as general and broad as paragraph 17. This being so, the rule that when a particular provision is inconsistent with a general provision the particular provision controls is not applicable herein.

A lease, like any other contract, should be given a reasonable interpretation (Civ. Code, § 1643). Paragraphs 16 and 17 should be read together. It is not reasonable to say that, although a lessor agrees that it shall not be released form liability for its negligent destruction of a lessee's property, as provided in paragraph 17, it shall be released under paragraph 16 for the very same negligent destruction. In other words, it is not reasonable to permit the lessor to say, "I am not relieved of liability to the lessee under paragraph 17 because the damage was caused by my own negligence but I am relieved of such liability by paragraph 16 because the lessee has waived any claim for such damage."

116

■ It is a cardinal rule of construction that a contract is to be construed as a whole, "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641; *Kerr* v. *Brede*, 180 Cal.App.2d 149, 151 [4 Cal.Rptr. 443]; *Sunset Securities Co.* v. *Coward McCann, Inc.*, 47 Cal.2d 907, 911 [306 P.2d 777].)

■ A fair and reasonable interpretation of a contract is to be preferred to one leading to a harsh and unreasonable result. Where one construction would make a contract unreasonable or unfair, and another construction, equally consistent with the language, would make it reasonable, fair and just, the latter construction is the one which must be adopted. (*Farmers Mut. Tel. Assn.* v. *Pacific Gas etc. Co.*, 173 Cal.App. 2d 102, 105 [343 P.2d 111]; *Cohn* v. *Cohn*, 20 Cal.2d 65, 70 [123 P.2d 833].)

■ Any ambiguity or uncertainty in a lease must be interpreted most strongly against the party who caused it. As stated in *Knox* v. *Wolfe*, 73 Cal.App.2d 494, 500 [167 P.2d 3] : "Since the lease was prepared by and under the direction of the lessor, its language must be interpreted most strongly against the lessor (§ 1654), and any doubt or ambiguity, if such there be in the lease, must be resolved against the lessor. [Citations.]"

Also pertinent herein is the following language in *City of Oakland* v. *Oakland etc. School Dist.*, 141 Cal.App.2d 733, 735-736 [297 P.2d 752] : "[I]n interpreting the lease, it must be borne in mind that the terms of the lease must be construed strictly against plaintiff, first because the lease was prepared by plaintiff [citations]; and secondly, because the indemnity provision purports to indemnify plaintiff against the results of its own negligence." This opinion quotes with approval from *Basin Oil Co.* v. *Baash-Ross Tool Co.*, 125 Cal.App.2d 578, 595 [271 P.2d 122], as follows: "'[W]here the language of an instrument purporting to exculpate one of the parties for its future negligence was prepared entirely by the party relying on its terms, words clearly and explicitly expressing that this was the intent of the parties are required [citations].'"

■ We hold that the trial court was correct in its ruling that plaintiffs' claims were not barred by the provisions of paragraph 16.

■ *Testimony of Janitor Anderson.* He testified that he only knew about one fire (the second) on the night in question. Plaintiffs' attorney stated his intention to impeach

Anderson with statements made prior to the trial, in which he admitted knowing about the first fire. There was no disagreement between counsel as to the propriety of the use of such statements for that purpose.

However, in a colloquy between court and counsel, the court made the following remark: "Well, the trier of fact then has a problem as to which statement to accept as being true, the way I understand it." This could be construed as indicating an erroneous concept by the court that the written statements were admissible, not only for the limited purpose of attacking Anderson's credibility, but also as evidence of the fact that he knew about the first fire. (See *Kroplin* v. *Huston*, 79 Cal.App.2d 332, 343 [179 P.2d 575]; *Hazel* v. *McGrath*, 212 Cal.App.2d 18, 21 [27 Cal.Rptr. 713].)

We think it unlikely that, considering the entire colloquy between court and counsel, the jury got such an erroneous impression. Moreover, at appellant's request, the jury was given the following instruction: "Now, evidence that on some former occasion a witness, not a party to this action, made a statement or statements, that were contradictory of his testimony here, may be considered by you only for the purpose of testing the credibility of the witness, not for the purpose of proving the truth of the statement." (The court had previously told the jury that Anderson was not a party to the action.)

Another instruction to the same effect, but expressly referring to Anderson by name, was also requested by appellant. It was not given, the trial court endorsing thereon "COVERED ELSEWHERE."

Appellant says that the foregoing proceedings caused the jury to be confused in judging Anderson's conduct. However, the only prejudice which appellant claims as the result of such alleged confusion is that it affected the jury's answer to the interrogatory, "Was the spread of the fire caused by a delay of John Anderson in reporting the fire to Walter Little?" The jury's answer is as follows: "Undecided because of contradictory testimony." As we pointed out earlier in this opinion, this means that respondents failed to sustain the burden of proof as to Anderson's negligence in this respect and the answer in legal effect was therefore in the negative

In our opinion, appellant suffered no prejudice from the claimed error.

*Testimony as to lack of sprinkler system.* Chief

Hayes of the Fire Prevention Bureau testified that he inspected the premises after the fire and that the building did not have a sprinkler system. There was no objection to this testimony and it seems to be conceded that it was relevant to the issue as to whether Little was required to exercise a greater *amount* of care because of the lack of such a system.

The witness was then asked "whether or not a sprinkler system would have in any way prevented the spread of this fire?"

Appellant's attorney made the following objection to this question: "I don't think that is one of the issues of the case *at this time*. Whether or not we required a sprinkler system I think will be something maybe your Honor will have to rule on later on. But I—I think it's immaterial *at this time* to ask this witness what the effect of a sprinkler system would be. It's irrelevant, immaterial. ... It's incompetent *at this time*, at the present state of the evidence. ... I don't think it's pertinent, your Honor, *at this time* in this case. That is the basis of my objection. It's incompetent, irrelevant and immaterial." (Italics ours.)

The objection was overruled, the question was rephrased at the request of the witness, and he answered that sprinklers would have contained the fire and put it out.

Appellant *now* argues on this appeal that the testimony was objectionable because a landlord is not liable as a general rule for a dangerous or defective condition of leased premises unless he is guilty of fraud or concealment or has covenanted to be so liable. In other words, that the tenant takes the premises as he finds them.

But the objection as made did not inform the trial court of such contention. The specific ground of the objection was the timeliness of the testimony. Appellant does not even argue such an objection now.

We think that the following rule is applicable to the instant situation: "When inadmissible evidence is offered, the opposing party must object and specifically state the grounds of his objection in such a manner that it clearly informs the court of the point . . . An objection specifying the wrong grounds, or a general objection, amounts to a waiver of all grounds not urged." (*Rupp* v. *Summerfield,* 161 Cal.App.2d 657, 662 [326 P.2d 912].)

Even assuming that it was error to overrule the objection, appellant has shown no prejudice. Testimony as to the effect of a sprinkler system upon the fire would in no way

affect or change the jury's specific finding that the spread of
the fire was caused by Little's failure to enter and inspect
the interior of the Armstrong premises. Thus, the verdict
against appellant would still be supported by such finding.

 *Instructions on negligence.* Appellant complains
of but one. It told the jury that, "if the owner [Mart] *or*
occupier [Armstrong] of premises allows them to remain in
such a condition as to constitute a danger to *other* property
in case of fire, his negligence in that respect will make him
liable for damage done to *such* property by a fire which started
on his premises although he was not responsible for and in
fact had no connection with the start of the fire." (Italics
ours.)

Defendant Penn Mutual, the owner, had been dismissed
from the action, leaving Mart as the sole defendant. The
latter was treated as the "owner" in the instruction. The
word "premises" was used to designate the space occupied
by Armstrong. The phrases "other property" and "such
property" were used to designate property in spaces *other
than* the "premises" where the fire started. Thus, the instruc-
tion is directed to the liability of Mart *and* Armstrong to the
tenants *other than Armstrong.* It has no application to the
liability of Mart to Armstrong. The reference to "or occu-
pier" might better have been deleted from the instruction,
which was drafted by plaintiffs, because Armstrong had been
eliminated from plaintiffs' case by way of nonsuit. However,
Mart was not prejudiced by the inclusion of Armstrong in
the instruction as the "occupier."

As to the plaintiffs, Mart contends that "the verdict may
have been based on its [the jury's] conclusion that either the
absence of a sprinkler system or the presence of curtained
partitions, or both, constituted a dangerous condition of the
Armstrong premises within the meaning of the instruction
under challenge."

The reference to partitions is not pertinent to this discus-
sion, inasmuch as the jury answered "No" to the special
interrogatory as to whether "the spread of the fire from the
Armstrong Cork premises [was] caused by a failure of Mart
Associates to construct the glass partitions all the way to the
ceiling."

As to the absence of a sprinkler system on the second floor,
Mart contends that this condition was "open and obvious to
anyone who became a tenant of premises on the second floor
of the building."

However, the jury was instructed at Mart's request as follows: "It is a prospective tenant's duty to make reasonable inspection of premises before taking possession; and the law holds that such tenant assumes the risk of any unsafe condition that comes to such tenant's attention or that would come to the tenant's attention if the tenant had made such an inspection and exercised ordinary care in doing so. Having thus assumed the risk of such condition the tenant or his assignee may not hold the landlord liable for injury resulting from it. Even if may be said that the landlord was negligent in permitting or creating that condition, such negligence is not actionable."

It is fundamental that instructions must be considered as a whole and with relation to the particular factual situation in question. (48 Cal.Jur.2d 196, Trial, § 164.)

We do not agree that the challenged instruction caused the jury to impose liability upon appellant only because it allowed the Armstrong premises to "remain in such a condition as to constitute a danger to other property." This jury specifically and expressly found that "the spread of the fire [was] caused by a failure of Walter Little to enter and inspect the interior of the Armstrong Cork premises."

The general verdict is supported by this special finding and may properly be sustained upon this basis alone. In our opinion, appellant suffered no prejudice from the giving of the challenged instruction.

*Armstrong's contributory negligence.* The trial court refused to instruct on this issue on the ground that there was no evidence to support it. No one connected with Armstrong was at or near the premises on the evening in question, nor did any person connected with Armstrong even know about either of the two fires until Spingola (Mart's head janitor) telephoned Armstrong's manager shortly before midnight.

After various proceedings had outside of the presence of the jury at the conclusion of plaintiffs' case on the issue of liability, the court made the following statement in the presence of the jury: "The question of origin of the fire is no longer before us. We have agreed that no one knows what caused this fire, so you don't have to worry about that. *The only question and issue now is*: Did the Mart Associates, who were the lessees of the building, negligently permit this fire to spread; and if so, the amount of damage sustained by the tenants? And one of the tenants now will be Armstrong Cork

Company, who had a cross-complaint against the Mart Associates for the damage caused to their property. Now, do you understand all that? Does that about sum it up, counsel?'' (Italics added.) To which Mart's counsel replied: ''I believe so, Your Honor.''

Just prior to this, outside of the presence of the jury, Armstrong's motion for a nonsuit as to Mart's cross-complaint against it had been granted. Mart did not even resist the motion.

Mart now raises the point that Armstrong ''stocked and displayed highly flammable or explosive products on the premises.'' There is no evidence that Armstrong used the premises for any purpose other than to ''display or sell ... furniture, home equipment, or related goods,'' as permitted by its lease.

In our opinion, there is no evidence that Armstrong either did or failed to do anything which proximately caused the spread of the fire and the trial court was correct in not instructing on the doctrine of contributory negligence.

The judgment entered upon the verdict in favor of plaintiffs and cross-complainant Armstrong and against defendant and cross-defendant Mart is affirmed; the order denying Mart's motion for judgment notwithstanding said verdict is affirmed; the judgment of nonsuit entered in favor of Armstrong on the cross-complaint of Mart and Penn Mutual is affirmed.

Shoemaker, P. J., and Taylor, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 22, 1964.